# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| DIANNE FAULKNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:14-cv-00120 |
| v. | ) | Senior Judge Haynes |
| | ) | |
| LIFECARE FAMILY SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Plaintiff, Dianne Faulkner, filed this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.; the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq.; the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-103; and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-401 et seq., against Defendant LifeCare Family Services ("LifeCare"), her former employer. Plaintiff's claims are that LifeCare terminated her and failed to accommodate her disability in violation of the ADA, retaliated against her for taking FMLA leave, discriminated against her because of her age, harassed and terminated her in violation of the TDA, and discriminated against her on the bases of age and disability in violation of the THRA.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 19), contending: (1) that Plaintiff's hostile work environment claim is without merit because Plaintiff fails to show sufficient facts establishing severe or pervasive harassment and because Defendant promulgated and enforced a harassment policy and Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Defendant; (2) that Plaintiff's claim for termination on the basis of disability must fail because Defendant had a legitimate,

non-discriminatory reason for terminating plaintiff pursuant to Defendant's job abandonment policy; (3) that Plaintiff's FMLA retaliation claim fails because she was not an eligible employee under the FMLA and because Defendant had a legitimate, non-discriminatory reason for her termination pursuant to Defendant's job abandonment policy; (4) that Plaintiff's ADEA claim fails because Plaintiff fails to show what actions attributable to Defendant allegedly constituted age discrimination and that Defendant had a legitimate, non-discriminatory reason for her termination; and (5) that Defendant reasonably accommodated Plaintiff's disability.

In her response (Docket Entry No. 34), Plaintiff concedes her hostile work environment, failure to accommodate, and FMLA retaliation claims. As to her remaining claims, Plaintiff contends: (1) that Defendant's assertion that Plaintiff was terminated pursuant to Defendant's job abandonment policy is pretextual as Defendant was on notice of Plaintiff's injury and absence; (2) that Plaintiff did not abandon her job, but was constructively discharged; (3) that Plaintiff can establish that Defendant's legitimate, non-discriminatory reason for terminating her is pretextual based upon the negative treatment Plaintiff received after her cancer diagnosis; and (4) that Plaintiff has established her claim under the ADEA.

In reply (Docket Entry No. 36), Defendant asserts: (1) that Plaintiff fails to present factual evidence that she believed that she gave adequate notice to comply with Defendant's job-abandonment policy; (2) that Plaintiff's constructive discharge claim was not alleged in her complaint and therefore waived and that, in any event, Plaintiff fails to show that Defendant created such intolerable working conditions forcing Plaintiff to quit; (3) that Plaintiff fails to show pretext; and (4) that Plaintiff fails to show she suffered an adverse employment action under the ADEA.

# I. FINDINGS OF FACT[1]

Plaintiff, Dianne Faulkner, was born on November 6, 1959. (Docket Entry No. 35, Plaintiff's Response to Defendant's Statement of Material Facts, at ¶ 1). On or about November 24, 2008, Plaintiff began working as a medical assistant for Defendant LifeCare in its Lawrenceburg office. Id. at ¶ 6. Plaintiff was interviewed and hired by Dr. Cynthia Rector, LifeCare's medical director, and Landon Mauck, LifeCare's human resources director. Id. at ¶¶ 2-3; Docket Entry No. 22 at ¶ 1. Mauck reported directly to LifeCare's executive director. Id. at ¶ 3.

LifeCare provides faith-based community mental health and counseling in various locations in Tennessee, including Lawrenceburg, Tennessee. Id. at ¶ 5. The LifeCare employees at Lawrenceburg, Tennessee also provide services to patients in satellite offices in Pulaski, Waynesboro, and in the past, locations such as Franklin and Columbia. Id. Plaintiff lived less than two miles from the Lawrenceburg LifeCare office. Id. at ¶ 7.

The Lawrenceburg office had four departments: front office, medical, therapy, and case management. Id. at ¶ 8. As a medical assistant, Plaintiff worked in the medical department. Id. Plaintiff's immediate operational supervisor was either the medical director, or at others times, the director of nursing. Id. These supervisors were not based in Lawrenceburg. Id. Similarly, two of the other Lawrenceburg departments did not have their immediate operational supervisors located in Lawrenceburg. Id. Rebecca Rahman, LifeCare's director of nursing, was Faulkner's supervisor.

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Because there are not any material factual disputes, this section constitutes findings of fact.

Id. Although Rahman was Plaintiff's direct operational supervisor, Rahman usually did not see Plaintiff on a daily basis because Rahman worked at LifeCare's Nashville facility. Id. at ¶¶ 8-9.

Christal Wise, LifeCare's Operations Administrator of the Lawrenceburg office, is the senior LifeCare employee at the Lawrenceburg office and is responsible for the day to day operations of that office and its satellite offices. Id. at ¶¶ 11-12. Wise had sole direct supervision over the front office department in Lawrenceburg. Id. at ¶ 12. Although Wise was not the operational supervisor of the other three departments in Lawrenceburg, Wise had the administrative responsibility to ensure that the Lawrenceburg employees were properly scheduled and present to attend to the needs of LifeCare's patients. Id. at ¶ 16. Thus, Wise was involved in counseling Plaintiff, when appropriate. Id.

Sandy Garland, who worked in the front office department, supervised Sarah Dunn who also worked in the front office. Id. at ¶ 13. Neither Garland nor Dunn had any supervisory responsibility over Plaintiff, such as making decisions or recommendations regarding the hiring, firing, promoting, demoting, implementing pay adjustments, or counseling of Plaintiff. Id. Plaintiff was aware that Garland did not have any role in making such decisions. Id. at ¶ 14. Also, Matt Speer, an employee in the therapy department in Lawrenceburg, did not have any supervisory responsibility, concerning the hiring, evaluation, promotion, compensation or discharge of Plaintiff. Id. at ¶ 15.

In approximately late May 2013, Plaintiff advised Wise she had been diagnosed with a form of cancer and believed her diagnosis of cutaneous lymphoma might be fatal. Id. at ¶ 17. In late June 2013, Plaintiff went to Philadelphia, Pennsylvania for treatment of her cancer. Id. at ¶ 18. Wise then placed an advertisement in a local newspaper for a medical assistant. Id. Wise testified that the position was for part-time PRN work and was to be used between several offices, not just the

Lawrenceburg office. (Docket Entry No. 34-2, Wise Deposition at p. 25). Wise explained that she

had concerns that Plaintiff might not return to work and believed that if Plaintiff could or would not

return to work, finding a qualified applicant to fill the medical assistant position at the Lawrenceburg

office would be a difficult and lengthy process. (Docket Entry No. 23, Wise Declaration, at ¶ 6).

Wise stated that she had previously run advertisements looking for applicants even when there was

only a possibility of a vacancy. Id.

When Plaintiff went to Philadelphia she used Personal Time Off ("PTO"), meaning LifeCare

paid Plaintiff for those days she was absent from work. Id. at ¶ 21. After Plaintiff returned from

Philadelphia and to work, Plaintiff did not want to work full time. Id. at ¶ 23. Plaintiff believed she

worked at least 48 hours per week, but as a salaried employee, Plaintiff did not receive overtime pay.

Id. at ¶¶ 28-29. On July 8, 2013, Plaintiff met with Wise and Rahman and stated that she wanted to

reduce her hours "as much as possible," but later stated during the meeting that she hoped to work

four days a week. Id. at ¶ 23. Plaintiff stated she was not physically able to work as much as she had

and also provide help to her children and grandchildren. Id. Wise explained that LifeCare did not

expect to find a medical assistant in the Lawrenceburg area willing to work only one day a week, but

LifeCare might be able to find someone who could work two days a week. Id. Plaintiff agrees that

it is easier for an employer to find someone willing to work two days a week, instead of only one

day. Id. at ¶ 24. Plaintiff, Rahman and Wise agreed that Plaintiff would work three days a week at

LifeCare. Id. at ¶ 23.

Beginning with the pay period ending July 31, 2013, Plaintiff was converted from a full-time

to a part-time employee with the intent that she would be scheduled for three eight hour days per

week. Id. at ¶¶ 25, 31. Plaintiff's annual full-time salary was $32,500. Id. at ¶ 30. As a part-time

hourly employee, Plaintiff was paid at the rate of $15.00 per hour and received the vision and dental insurance that she received as a full-time employee. Id. at ¶ 31. Plaintiff remained on the LifeCare dental and vision programs throughout the remainder of her employment at LifeCare. Id. As to medical insurance, since the beginning of 2012, LifeCare stopped providing its employees with medical insurance, but did provide them with an allowance to assist them in the purchase of their own medical insurance. Id. at ¶ 27. From that time until when Plaintiff ceased working at LifeCare, Plaintiff received this allowance. Id.

In August 2013, LifeCare hired Cheryl Chambers, who was 46 years old, as a medical assistant on a part-time basis to cover the two days when Plaintiff was not working. Id. at ¶ 32. In October 2013, Plaintiff wanted to return to full-time work, and Chambers gave notice that she was quitting her part time job with LifeCare. Id. at ¶ 35. Chamber's stopped working at LifeCare on October 15, 2013. Id. On Monday, October 21, 2013, Plaintiff returned to a full-time work schedule. Id. at ¶ 35. On October 28, 2013, Plaintiff left work early to see a doctor and later presented to LifeCare a nurse's note excusing her from work until November 4, 2013. Id. at ¶ 38. Plaintiff stated that she was diagnosed with shingles. Id.

Although Wise expected Plaintiff to do so, Plaintiff did not return to work on November 4, 2013. Id. at ¶¶ 39-40. Wise heard from another employee that Plaintiff stated that she hurt herself from a fall and could not return to work. Id. Although Rahman was Plaintiff's direct supervisor, Plaintiff did not communicate with Rahman about why she was absent or when she expected to return to work. Id. at ¶ 43. On November 4, 2013, Rahman traveled from Nashville to Lawrenceburg to perform the work that Plaintiff was expected to perform that day. Id. at ¶ 41. Wise telephoned Plaintiff, but did not receive an answer. Id. at ¶ 39. That afternoon Wise and Rahman

traveled to Plaintiff's house in Lawrenceburg to speak with Plaintiff, but Plaintiff did not answer the door. Id. at ¶ 44. According to Plaintiff, she was groggy from a pain pill and fell asleep. Id. at ¶ 45. Plaintiff alleges that she suffered a hair line fracture of her collar bone. Id. at ¶ 46.

On November 4, 2013, Plaintiff's husband, Orville Scottie Faulkner, called Sandy Garland at LifeCare to advise her that his wife was hurt. Id. at ¶ 48. Plaintiff testified that she received a doctor's note concerning her broken collarbone and thought that her husband gave it to LifeCare, but Orville Faulkner testified that he did not provide any paperwork or documentation to LifeCare. Id. at ¶¶ 49-50.

On November 8, 2013, Mauck telephoned Plaintiff, and Plaintiff informed Mauck that she had not returned to work because of a medical condition that would cause her to miss work for a period of time. Id. at ¶ 51. Mauck told her that she was ineligible for FMLA leave because LifeCare did not have the required number of employees within 75 miles of her work station, but that she could submit a request for a leave of absence. Id.; Docket Entry No. 25, Plaintiff Deposition at p. 92. After November 8, 2013, Mauck did not receive any communication from Plaintiff, nor did he receive a request for leave or a health care provider's note reflecting that Plaintiff was unable to return to work on or after November 4, 2013. Id. at ¶ 52. Supervisory personnel at the Lawrenceburg office advised Mauck that Plaintiff did not send them a written request for leave or a health care provider's documentation concerning her absence on or after November 4, 2013. Id. Plaintiff never returned to work after November 4, 2013, not even to obtain a few personal items she left. Id. at ¶¶ 40, 72.

Plaintiff testified that during their November 8, 2013 telephone conversation Mauck said that he would send Plaintiff a request for leave of absence form to her home email address, but that she

never received it. Id. at ¶ 53; Docket Entry No. 34-3, Muack Deposition at p. 24. Plaintiff explained that she did not follow up with anyone at LifeCare about getting the leave of absence form because she believed that if she did not qualify for FMLA, then she did not qualify for a leave of absence. Id. at ¶ 54. Plaintiff admits that she never communicated with Rahman on or after November 4, 2013. Id. at ¶ 43. Plaintiff, however, states that she communicated with co-workers, Dunn and Speer on or after November 4, 2013. (Docket Entry No. 34-5, Dunn Deposition at pp. 20-21; Docket Entry No. 34-7, Speer Deposition at pp. 16-17).

When Plaintiff began her employment at LifeCare, she received the LifeCare Family Services Employee Handbook and also received an updated version online. (Docket Entry No. 35 at ¶¶ 56, 58). Plaintiff was required to read and familiarize herself with the handbook's policies and procedures. Id. The handbook provides that "[e]mployees, who voluntarily resign their employment, fail to return from an approved leave of absence, or fail to report for three (3) consecutively scheduled work days without notice to, or approval of the Executive Director, will be considered to have voluntarily terminated their employment with LCFS." Id. at ¶ 57. The handbook also provides that:

> Employees may apply in writing to the Human Resources Director for an unpaid leave of absence not to exceed sixty (60) calendar days. Such applications must state the reasons for the leave, length of time needed and return date. The LCFS Human Resource Department must be notified of all such leaves.

Id. at ¶ 59; Docket Entry No. 29-4 at 7. The handbook does not require a specific form to request a leave of absence, and Plaintiff was not required to use a specific form to request a leave of absence. Id. at ¶ 59.

According to Mauck, based upon the terms of the handbook, he terminated Plaintiff because Plaintiff missed three unexcused, consecutively scheduled work days. Id. at ¶ 60. Mauck testified that "[o]ur policy says three days, but literally we didn't hear from Ms. Faulkner for almost a month. Usually with someone's leave of absence, I hear from them within a couple of days or a week. The fact two or three weeks to a month it was unusual." (Docket Entry No. 34-3, Mauck Deposition at p. 29). LifeCare has discharged other employees who have violated this same policy. (Docket Entry No. 35 at ¶ 61). LifeCare is aware of no other occasion when LifeCare has not followed this policy. Id.

Because Plaintiff did not return to work after November 4, 2013, Rahman sought other arrangements to cover Plaintiff's absence with qualified medical assistant help. Id. at ¶ 42. On November 18, 2013, Jodi Long applied with LifeCare for a full time position as a medical assistant. (Docket Entry No. 37-1, Rahman Second Declaration, Attachment thereto). Mauck testified that around the beginning of December 2013 he made the decision to terminate Plaintiff and was advised by LifeCare's attorney to make her termination date the last day Plaintiff was scheduled to return to work, Monday November 4, 2013. (Docket Entry No. 34-3, Mauck Deposition at pp. 25-26, 31). Rahman testified that the decision to terminate Plaintiff was made on November 30, 2013. (Docket Entry No. 34-4, Rahman Deposition at p. 40). According to Rahman, LifeCare hired Long in December 2013 to fill the medical assistant vacancy in Lawrenceburg and that payroll records reflect that Long's first day of work at LifeCare was on December 2, 2013. (Docket Entry No. 27, Rahman Declaration at ¶ 4; Docket Entry No. 37, Rahman Second Declaration at ¶ 1). Long was 42 years old at the time of her employment. (Docket Entry No. 37-1 at 1). Mauck did not receive any communication from Plaintiff after November 8, 2013 until approximately the middle of December

2013 when LifeCare received a charge of discrimination from the Equal Employment Opportunity Commission concerning Plaintiff. (Docket Entry No. 35 at ¶ 62).

## II. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving

party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (citations omitted).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> . . . .
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material

fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:
In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be

read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43,

46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a

summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the

13

nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1.     Complex cases are not necessarily inappropriate for summary judgment.

2.     Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.     The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4.     This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6.     As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.    The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9.    The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.    The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

## A. ADA and TDA Claims

The ADA was enacted to counterbalance society's historic tendency to isolate and segregate individuals with disabilities. 42 U.S.C. § 12101. The ADA serves as a mechanism to level the playing field so that individuals living with disabilities are treated fairly and afforded equal opportunity within the workplace, among other areas. Id. Thus, the ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.
§ 12112(a).

To recover on a claim of discrimination under the ADA, a plaintiff must show that: (1) she
is an individual with a disability; (2) she is "otherwise qualified" to perform the job requirements,
with or without reasonable accommodation; and (3) she was either denied a reasonable
accommodation for her disability or she suffered an adverse employment action solely because of
her disability. Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996); Smith v.
Ameritech, 129 F.3d 857, 866 (6th Cir. 1997). "The term 'qualified individual' means an individual
who, with or without reasonable accommodation, can perform the essential functions of the
employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A plaintiff may
prove that she was discriminated against based upon her disability either through direct or indirect
evidence. Monette, 90 F.3d at 1178.

The Sixth Circuit has stated that if a plaintiff presents direct evidence of disability
discrimination:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The
> plaintiff bears the burden of establishing that he or she is "otherwise qualified" for
> the position despite his or her disability: (a) without accommodation from the
> employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a
> proposed reasonable accommodation. (3) The employer will bear the burden of
> proving that a challenged job criterion is essential, and therefore a business necessity,
> or that a proposed accommodation will impose an undue hardship upon the
> employer.

Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 452-53 (6th Cir. 2004) (quoting Monette, 90
F.3d at 1186).

However, where a plaintiff seeks to establish discrimination through indirect evidence, courts employ the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) burden-shifting approach so that the

> plaintiff may establish a prima facie case of discrimination by showing that: (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. The defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times.

Hedrick, 355 F.3d at 453 (quoting Monette, at 1186-87); Ferrari v. Ford Motor Co., 826 F.3d 885, 894 (6th Cir. 2016); Torok v. Gibralter Veterinary Hosp., Inc., 442 F. Supp.2d 438, 457 (E.D. Mich. 2006) ("Whether Plaintiff proceeds under the 'direct evidence' or the McDonnell Douglas burden-shifting mode of analysis, she cannot succeed on an ADA claim of disability discrimination absent a showing that she is 'disabled' within the meaning of the statute."). A plaintiff's disability must be a "but for" cause of the adverse employment action. Demyanovich v. Cadon Plating & Coatings, LLC, 747 F.3d 419, 433 (6th Cir. 2014). A TDA claim is analyzed under the same principles as those used for the ADA. Nance v. Goodyear Tire & Rubber Co., 527 F.3d 539, 553 n.5 (6th Cir. 2008).

Here, Plaintiff's proof of discrimination is by circumstantial evidence. Defendant contends that, assuming *arguendo* that Plaintiff can establish a prima facie case under the ADA, Defendant had a legitimate, non-discriminatory reason for Plaintiff's termination because Plaintiff failed to report for three consecutively scheduled work days without notice to or approval of the executive director, in violation of the employee handbook. The undisputed facts reflect that Plaintiff received

and was required to read and familiarize herself with the employee handbook's policies and procedures. The handbook specifically states that "[e]mployees, who voluntarily resign their employment, fail to return from an approved leave of absence, or fail to report for three (3) consecutively scheduled work days without notice to, or approval of the Executive Director, will be considered to have voluntarily terminated their employment with LCFS." (Docket Entry No. 35 at ¶ 57). Plaintiff does not dispute that Defendant has discharged other employees who have violated this policy and that there is not any evidence of an instance where Defendant has not followed this policy.

Here, Plaintiff missed three unexcused scheduled work days by not showing up to work during the week of November 4 and also after Mauck spoke to her on November 8, 2013. Plaintiff did not contact the executive director or even Plaintiff's supervisor anytime on or after November 4, 2013, seeking approval to be absent from work or notifying them of her absence. Moreover, after speaking with Mauck on November 8, 2013, Plaintiff did not submit any documentation in support of her injury or a request for a leave of absence. Nor did Plaintiff have any contact with Mauck after November 8, 2013.

Based on the undisputed evidence, Defendant has stated a legitimate, nondiscriminatory reason for Plaintiff's termination. The burden now shifts to Plaintiff to demonstrate that Defendant's proffered reason for her termination was a pretext for Defendant's unlawful action.

A plaintiff can demonstrate pretext by showing: "'(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action.'" Ferrari, 826 F.3d at 895 (citations omitted). Yet, "[i]f an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made

18

its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext." Tingle v. Arbors at Hilliard, 692 F.3d 523, 530-31 (6th Cir. 2012). Thus, "'[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." Id. at 531 (citations and internal quotation marks omitted). The Sixth Circuit has noted that the "'key inquiry . . . is whether the employer made a reasonably informed and considered decision before taking the complained-of action." Id. (citations and internal quotation marks omitted). To be sure, "[t]he employer certainly must point to particularized facts upon which it reasonably relied[,] [b]ut [it is not required] 'that the decisional process used by the employer be optimal or that it left no stone unturned." Id. (citations omitted).

In turn, to defeat a summary judgment motion, the "'plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action'[,] [such as] . . . evidence that an error by the employer was 'too obvious to be unintentional." Id. (citations omitted). Yet, "'[a]n employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." Id. (citations omitted).

Plaintiff argues that she can establish pretext based upon her negative treatment "after her cancer diagnosis, which makes a showing that the proffered reason for her termination did not actually motivate her termination." (Docket Entry No. 34 at 15). As evidence of pretext, Plaintiff cites that "Wise visited Ms. Faulkner at her house prior to Ms. Faulkner's trip to Philadelphia" and that Wise asked for Plaintiff's travel itinerary and pathology report for Plaintiff's "HR file;" that

Plaintiff "felt completely uncomfortable in the workplace in the latter half of 2013;" that "[c]o-worker Dunn observed that the work environment deteriorated and there was noticeable tension each time Ms. Faulkner walked into the office;" that "[w]hen [Plaintiff] had the meeting with Rahman and Wise requesting the fourday work week accommodation, there was already an ad in the paper for her job position;" that "Sarah Dunn testified that the ad was actually placed while [Plaintiff] was in Philadelphia receiving cancer treatment;" that "[a]fter her cancer diagnosis, [Plaintiff] was called into Wise's office at least two times and left the meetings very upset;" and that Plaintiff "was put on a corrective action plan that she did not even fully understand, because she was told by Rahman beforehand to just smile in the meeting, agree to what was said, sign the paper, and everything would be fine and go back to normal." Id. at 15-16; Docket Entry No. 34-1, Plaintiff Deposition at pp. 97-100.[2]

---

[2]Plaintiff also cites other evidence as grounds for pretext that is inadmissible for various reasons, and even if it were considered, such evidence would be insufficient in showing pretext. Plaintiff cites that "Wise allegedly told Speer that she did not think Ms. Faulkner actually had cancer." (Docket Entry No. 34 at 15, ¶ 1). Yet, Speer testified that he was *told* that someone said that "they didn't believe Ms. Faulkner had cancer," but did not directly hear it and that he did not recall anyone "saying anything negative about Ms. Faulkner's cancer diagnosis," (Docket Entry No. 34-7, Speer Deposition at pp. 12-13). Thus, Plaintiff's proffered statement is inadmissible hearsay. Plaintiff also cites her allegations in her complaint that "Wise 'barraged' Ms. Faulkner with texts and phones when Ms. Faulkner was in Philadelphia, 'demanding to know what was going on and what the doctors were saying,'" and "[o]n July 8, 2013, Wise and Rahman 'interrogated' Ms. Faulkner about 'her diagnosis, her prognosis and treatment schedule.'" (Docket Entry No. 34 at 15, ¶¶ 3-4). Plaintiff, however, may not rely on allegations in her complaint as evidence. "To defeat a motion for summary judgment, a plaintiff 'can no longer rely on the conclusory allegations of [her] complaint.'" Warf v. U.S. Dept. of Veteran's Affairs, 713 F.3d 874, 878 (6th Cir.2013) (citation omitted). The plaintiff must present "probative evidence tending to support the complaint." Liberty Lobby, 477 U.S. at 256; see Celotex, 477 U.S. at 323–24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]"). Further, Plaintiff's proffered evidence that "after learning of Ms. Faulkner's collarbone injury" Wise "'demanded information about Plaintiff's injury'" is not supported by Wise's cited deposition testimony (Docket Entry No. 34 at 16, ¶ 5); that "Wise and Rahman went to Ms. Faulkner's home and 'viciously beat on her front door, and peered in windows' and were rude to Ms. Faulkner's

Plaintiff's proof is insufficient in showing that Defendant's stated reason for Plaintiff's termination to be pretextual. By Wednesday, November 13, 2013, Plaintiff had failed to appear for work for a third consecutive day after her Friday November 8 conversation with Mauck. Plaintiff testified that she did not follow up about getting a leave of absence request form because she thought that if she did not qualify for FMLA, then she must not qualify for a leave of absence. Plaintiff lived less than two miles from work, but she never went to her office to get any leave form or provide a doctor's note reflecting that she could not return to work on or after November 4, 2013. Further, the handbook does not state that a specific form is required to request leave as all that is required is that an employee apply in writing to the human resources director for an unpaid leave of absence. Moreover, Plaintiff never contacted the executive director or a supervisor at anytime on or after November 4, 2013. Plaintiff does not dispute that Defendant has discharged other employees who have not complied with the employee handbook's terms and that there is not any evidence of an instance where Defendant has not followed this policy. The evidence also reflects that Long did not apply for the full time medical assistant job until November 18, 2013, after Plaintiff had not taken any steps demonstrating that she had not abandoned her employment.

Accordingly, the Court concludes that a reasonable juror could find that Defendant's stated reasons for Plaintiff's termination were not pretext for disability discrimination.

### B. Constructive Discharge

---

neighbor and insinuated to the neighbor that she was not really hurt," is not supported by Wise's and Rahman's cited deposition testimony and contains inadmissible hearsay testimony, id. at 16, ¶ 6; and that "Dunn asked co-worker Garland about [the advertisement that was placed while Ms. Faulkner was in Philadelphia receiving cancer treatment] and Garland replied that it was Ms. Faulkner's position, but she didn't know if Ms. Faulkner had been fired or not," is inadmissible hearsay, id. at 16, ¶ 10.

Plaintiff did not assert a claim for constructive discharge in her complaint, but raises it for the first time in her response to Defendant's motion for summary judgment. This claim is waived as Plaintiff "first argued constructive discharge in response to the [Defendant's] motion for summary judgment." Eichaker v. Vill. of Vicksburg, 627 F. App'x 527, 533-34 (6th Cir. 2015) (citing City of Columbus, Ohio v. Hotels.com, L.P., 693 F.3d 642, 650 (6th Cir. 2012)).

### C. ADEA and THRA Claims

The ADEA prohibits an employer from discriminating against an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). Courts "apply the same analysis to age-discrimination claims brought under the THRA as those brought under the ADEA." Bender v. Hecht's Dep't Stores, 455 F.3d 612, 620 (6th Cir. 2006). A plaintiff has the burden of persuasion to show that "age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009). A plaintiff "may establish a violation of the ADEA by either direct or circumstantial evidence." Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009). Absent direct evidence, like here, claims under the ADEA are also evaluated using the McDonnell Douglas test. Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 264 (6th Cir. 2010). Thus, a plaintiff must prove that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the job in question; and (4) circumstances supporting an inference of discrimination. Blizzard v. Marion Technical Coll., 698 F.3d 275, 283 (6th Cir. 2012). "An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant." Id. The Sixth Circuit has established a bright-line rule where "'in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not

significant.'" Id. at 284 (quoting Grosjean v. First Energy Corp., 349 F.3d 332, 340 (6th Cir. 2003)).

Yet, "while an age difference of ten or more years is generally considered significant, replacement of the employee by a person who is six to ten years her junior must be considered on a case-by-case basis." Id. (citations omitted).

Defendant contends that Plaintiff cannot show that she was replaced by a younger employee, citing Blizzard where the Court stated that an employee is "replaced only when another employee is hired or reassigned to perform the plaintiff's duties." Blizzard, 698 F.3d at 284 (citation and internal quotation marks omitted). Here, the undisputed facts show that Plaintiff requested a reduction in hours and agreed that it is generally easier for an employer to find someone willing to work two days a week, instead of only one day. Chambers was hired to work the two days that Plaintiff was not working. Further, when Plaintiff expressed interest in returning full time, Defendant returned Plaintiff to a full-time work schedule. Thus, Plaintiff worked the hours Chambers previously worked. The undisputed facts also demonstrate that Long did not replace Plaintiff until after Plaintiff was terminated pursuant to Defendant's job abandonment policy.

Citing Shohadaee v. Metro Gov't of Nashville & Davidson County, 150 F. App'x 402 (6th Cir. 2005), Plaintiff argues that she suffered an adverse employment action when she requested working four days a week upon her return from receiving cancer treatment, but was reduced to a three day work week and faced the potential of losing her vision and dental insurance. In Shohadaee, the Sixth Circuit stated that "[a] reassignment may be an adverse employment action if it constitutes a demotion evidenced by 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" Id. at 404 (citations omitted). Yet, the undisputed facts show that Plaintiff agreed to work three days

because it is generally easier for an employer to find someone willing to work two days a week, instead of one day. Further, Plaintiff never lost her vision or dental insurance benefits.

Plaintiff also argues that Plaintiff suffered an adverse employment action when she was constructively discharged. As stated earlier, this claim is waived. Thus, this Court concludes that Plaintiff has failed to establish a prima facie case of age discrimination.

In any event, for the reasons stated previously, Defendant has established that Plaintiff was terminated for the legitimate, non-pretextual reason that she did not report to work for three consecutive days and did not follow Defendant's policy concerning leave of absence.

Accordingly, for these reasons the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 19) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of September, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge